UNITED STATES DISTRICT COURT
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMIA SHYMANSKY f/k/a WYNEIKA WILBURN,<br><br>                       Plaintiff,<br><br>                    -vs-<br><br>CITY OF NEW YORK, ERIC ADAMS, in his official capacity as Mayor of the City of New York, 2021 – 2025, ZOHRAN MAMDANI, in his official capacity as Mayor of New York City, NEW YORK CITY POLICE DEPARTMENT, EDWARD CABAN, in his official capacity as Police Commissioner, 2023 – 2024, JESSICA TISCH, in her official capacity as Police Commissioner, since 2024 and Commissioner of the Department of Sanitation of New York, 2022 – 2024, EMILY COLLINS, BRIAN MCCAFFREY, ASYA ABBAS, NICOLE MOCCIO, DR. CHRISTINA GILLE, DR. ADAM BLOOM, DR. LOKESH REDDY, KEVIN RAMNARAIN, UNIDENTIFIED TESLA DRIVER on 11/15/24, NEW YORK CITY EMPLOYEES' RETIREMENT SERVICES, MAYA KHODOS, NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES, MOLLY WASOW PARK, in her official capacity as Commissioner, UNIDENTIFIED ADMINISTRATIVE STAFF ANALYST ASSIGNED TO 33 BEAVER ST, DEPARTMENT OF SANITATION OF NEW YORK, JAVIER LOJAN, in his official capacity as Commissioner, CHRISTOPHER KLINGLER, UNIDENTIFIED MAINTENANCE WORKER AT BK11 2017 – 2018, CONSOLIDATED EDISON, INC., ORANGE & ROCKLAND UTILITIES, INC., NEW YORK STATE DEPARTMENT OF PUBLIC SERVICES, JIJ AUCTION SERVICES, LTD, POMONA AUTO WORKS, INC., THREE STAR SERVICE CENTER, INC., BATTINELLI ENTERPRISES, ACORN TREE CARE, LLC, UNIDENTIFIED MALE AT POMONA AUTO WORKS, INC. on 11/15/24, MUNICIPAL CREDIT UNION, and | Case No. 1:26-cv-<br><br>**COMPLAINT**<br><br>Jury Demand |

UNKNOWN CONSPIRATORS, fictitious
and/or unknown to the plaintiff,

                              Defendants.

DEMIA SHYMANSKY f/k/a WYNEIKA WILBURN ("Demia"), the plaintiff in the above-captioned proceeding, brings this suit against CITY OF NEW YORK (the "City"), ERIC ADAMS, in his official capacity as Mayor of the City of New York, 2021 – 2025, ZOHRAN MAMDANI, in his official capacity as Mayor of New York City, NEW YORK CITY POLICE DEPARTMENT ("NYPD" or the "Department"), EDWARD CABAN, in his official capacity as Police Commissioner, 2023 – 2024, JESSICA TISCH, in her official capacity as Police Commissioner and Commissioner of the Department of Sanitation of New York, 2022 – 2024, EMILY COLLINS, BRIAN MCCAFFREY, ASYA ABBAS, NICOLE MOCCIO, DR. CHRISTINA GILLE, DR. ADAM BLOOM, DR. LOKESH REDDY, KEVIN RAMNARAIN, UNIDENTIFIED TESLA DRIVER on 11/15/24 (the "Tesla Driver"), NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, MAYA KHODOS, NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES, MOLLY WASOW PARK, in her official capacity as Commissioner, UNIDENTIFIED ADMINISTRATIVE STAFF ANALYST ASSIGNED TO 33 BEAVER ST, DEPARTMENT OF SANITATION OF NEW YORK ("DSNY"), JAVIER LOJAN, in his official capacity as Commissioner, CHRISTOPHER KLINGLER, UNIDENTIFIED MAINTENANCE WORKER FROM BK11 2017 – 2018, CONSOLIDATED EDISON, INC. ("ConEd"), ORANGE & ROCKLAND UTILITIES, INC. ("ORU"), NEW YORK STATE DEPARTMENT OF PUBLIC SERVICES ("DPS"), JIJ AUCTION SERVICES, LTD ("JIJ Auction"), POMONA AUTO WORKS, INC. ("Pomona Auto"), THREE STAR SERVICE

CENTER, INC., BATTINELLI ENTERPRISES, ACORN TREE CARE, LLC ("Acorn Tree"), UNIDENTIFIED MALE AT POMONA AUTO WORKS, INC. on 11/15/24 ("Manager John"), MUNICIPAL CREDIT UNION ("MCU"), and UNKNOWN CONSPIRATORS, fictitious and/or unknown to the plaintiff alleges as follows:

## NATURE OF ACTION

1.      This action seeks compensatory and punitive damages pursuant to 18 U.S.C. §§ 1964(c) and (d), 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1344, 18 U.S.C. § 1346, 18 U.S.C. § 1951 (the "Hobbs Act"), 18 U.S.C. § 1030, 18 U.S.C. § 2520, 42 U.S.C. § 1986, 18 U.S.C. § 1001, 18 U.S.C. § 664, 18 U.S.C. § 2520, and common law fraud. Demia seeks compensation for damages sustained as result of theft, extortion, mail fraud, wire fraud, computer-related fraud, common law fraud, and hacking committed by the defendants, in sum or in part.

2.      Within the past year, allegations of corruption plaguing the city government filled newspapers and media airwaves. ERIC ADAMS and several members of his administration were charged with fraud, extortion, and bribery. *See* News Reports, Ex. A. Recently, his most trusted advisors were arrested and charged with bribery by the United States Department of Justice ("DOJ"). *See* News Reports, Ex. A. Former executives, who refused to play by his rules, accused Adams of running the government as his own criminal enterprise. *See* News Reports, Ex. A. And when they were not complicit, their cognitive abilities were publicly challenged right before they were pushed out of office. Crap runs downhill.

3.      The type of conduct described by Mr. Adams' accusers is similar to that exhibited by the defendants in the instant case. Although he left office, it is clear that his policies

3

did not follow. The charges by his accusers cannot be trivialized as mere allegations. The truth lies therein. We can't all be wrong.

4.    The defendants willfully participated in a scheme to defraud Demia out of her personal property, including but not limited to, money and her vehicle by misappropriating intelligence resources issued by and/or maintained by the City to steal property and extort her for money. Collectively, they devised and executed an intricate plan that unfolded over years with the purpose of depriving Demia of her assets. This case focuses on one (1) vehicle, but the culprits also stole her husband's vehicle using similar means − create the appearance of a lawful taking, such as a tow, store the vehicle at a private gas station, demand money, deny the owner the ability to retrieve the vehicle, and then dispose of the vehicle. It seems normal, even legitimate, except for the parties involved. As soon as their plan is discovered, they destroy the evidence and feign ignorant. All of the markings of racketeering.

5.    Hence, the focus on one (1) car, one (1) electric bill, one (1) tree, and one (1) well-devised plan.

## PARTIES

6.    Demia is a resident of the State of New York (the "State") and an attorney licensed in the State. She formerly worked for the City in a non-legal capacity.

7.    The City is a municipality located in the State and the former employer of Demia and her deceased husband. Upon information and belief, certain parties employed by the City may have used Demia's and/or her husband's information to defraud her of her inheritance. Because they both worked in law enforcement, they were subject to background investigations, which resulted in the creation of extensive personnel profiles, irrespective of legitimacy. While

4

Demia was employed with the City, an employee threatened to take all of her property. Since that time, she was illegally displaced, subjected to vehicular theft, and dragged into a foreclosure proceeding. Its involvement, by and through its employees and/or representatives, is being determined. UNKNOWN CONSPIRATORS, fictitious and/or unknown to the plaintiff, are believed to be persons known to employees of the City and willing participants of the enterprise.

8.    ERIC ADAMS served as mayor of the City from 2021 – 2025. Upon information and belief, during his administration, the misappropriation of intelligence resources escalated for the purpose of harassment, discrimination, and/or other impropriety. It is further believed that such activity was part of an unwritten mandate for career advancement within the administration and throughout City government.

9.    ZOHRAN MAMDANI has served as mayor of the City since January 2026. During his administration, the defendants have gone through great efforts to cover up their previous misconduct, thereby engaging in additional impropriety.

10.    NYPD is a law enforcement agency within the City. It is charged with enforcing the laws governing the City, investigating the violations of those laws, and other activities necessary to facilitate and/or support the public safety efforts of the City. It employs approximately 36,000 uniformed members of service along with 19,000 civilians. Demia worked at the Department from April 1, 2019 until July 25, 2023, at which time she was placed on involuntary leave until her permanent dismissal on November 18, 2025.

11.    EDWARD CABAN served as Police Commissioner of NYPD from 2023 – 2024. Thomas Donlon was installed as the interim police commissioner prior to JESSICA TISCH's permanent appointment. During his tenure, members of service employed intelligence resources

5

to engage in impropriety without restriction, and only parties closely connected to Mr. Adams and/or agreeing to such participation were awarded with adequate advancement opportunities.

12.    JESSICA TISCH has been serving as the current Police Commissioner since November 2024. Prior to that time, she was the Commissioner of DSNY. Upon information and belief, members of DSNY continued their practice of harassment, tortious interference, and other impropriety without proper prevention methods. While serving as the Police Commissioner, the defendants continued their abuse of intelligence resources before attempting to cover up their misconduct.

13.    EMILY COLLINS is an executive agency counsel assigned to the Department Advocate's Office, which handles disciplinary matters on behalf of NYPD. It is believed that she authored disciplinary charges against Demia for the purpose of blocking Demia's promotion and further encouraged members of the Medical Division of NYPD to require that Demia seek medical attention in connection with her employment.

14.    BRIAN MCCAFFREY is an agency attorney employed by NYPD. He authored and served as lead counsel in an administrative proceeding to terminate Demia constructively without legal basis.

15.    ASYA ABBAS is an agency attorney employed by NYPD. She served as co-counsel in an administrative proceeding to terminate Demia constructively without legal basis.

16.    NICOLE MOCCIO is an agency attorney employed by NYPD. She served as co-counsel in an administrative proceeding to terminate Demia constructively without legal basis.

17. DR. CHRISTINA GILLE is an unlicensed psychologist employed by NYPD and assigned to its Medical Division. She is charged with assessing fitness of duty of members of service in addition to other responsibilities.

18. DR. ADAM BLOOM is a licensed psychologist employed by NYPD and assigned to its Medical Division. He supervises lower-titled psychologists, including Dr. Gille. It is believed that at the time Demia was placed on involuntary leave, Dr. Bloom's license was not registered.

19. DR. LOKESH REDDY is a licensed psychiatrist employed by NYPD and assigned to its Medical Division. He acts in a managerial role.

20. The Tesla Driver is believed to be Robert Barrows, an attorney employed by NYPD during the respective time period. As part of his participation in the enterprise, he reached the level of Assistant Commissioner for a newly-created division. He was not charged with conducting investigations while serving in that role. He had and continues to have access to the Department's intelligence resources due to his executive status.

21. KEVIN RAMNARAIN is an agency attorney previously assigned to the Crime Response Team, a discreet unit authorized and usually acted under the direction of Eric Adams during his tenure as mayor of the City.

22. NEW YORK CITY EMPLOYEES' RETIREMENT SERVICES ("NYCERS") is the primary pension fund for the City's employees.

23. MAYA KHODOS currently serves as General Counsel of NYCERS. At the time that she wrongfully denied payment of Demia's pension claim, she was Deputy General Counsel before transitioning to a director of compliance at a non-profit organization. She later

returned to NYCERS in a higher-ranking position. It is believed that her denial resulted in a personal benefit to Ms. Khodos.

24.     NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES ("DSS") is an agency of the City charged with providing, administering, monitoring, and investigating programs within the City concerning food and housing insecurities.

25.     MOLLY WASOW PARK served as commissioner of DSS from 2023 – 2026. During her tenure, employees participated in the widespread abuse of intelligence resources for the purpose of harassment and discrimination without adequate controls.

26.     UNIDENTIFIED ADMINISTRATIVE STAFF ANALYST ASSIGNED TO 33 BEAVER STREET ("the Unidentified Analyst") is believed to be Andrei Yermakou, who previously worked as an Associate Staff Analyst at DSNY before being promoted to Administrative Staff Analyst at DSS.

27.     DSNY collects and manages the waste material of the City. It was Demia's employer from August 2017 until December 2018, at which time she left abruptly due to the hospitalization of her husband in the intensive care unit and her manager's denial of her request for sick leave.

28.     JAVIER LOJAN served as Acting Commissioner for DSNY from 2024 to 2026. Upon information and belief, DSNY employees, active or retired, abused intelligence resources provided by the City for their personal benefit.

29.     CHRISTOPHER KLINGLER served as the chief of the Enforcement Division of DSNY during Demia's tenure. Enforcement was the law enforcement arm of DSNY. In or around May 2018, Demia began reporting directly to Mr. Klingler. Upon information and

belief, Mr. Klingler retired from DSNY, but he continues to access intelligence resources employed by the City for his personal benefit.

30.    Maintenance Worker was a Sanitation Enforcement Agent assigned to BK11 of DSNY and performed maintenance duties during Demia's tenure at the agency.

31.    ConEd is a provider of electricity within the State, and it has full control over ORU as its parent company. Its headquarters are located within the State. Additionally, ORU lacks an executive staff separate and distinct from ConEd.

32.    ORU is a wholly-owned subsidiary of ConEd, and the provider of utility services to the property owned by Demia. It provides electricity within the State as well as New Jersey, thereby subjecting it to federal laws governing utility services due to its engagement in interstate commerce. Its investment strategy and annual financial statements are reported to the U.S. Securities and Exchange Commission on ConEd's mandatory filings in lieu of a separate filing under a separate ticker and/or other company identification.

33.    DPS is an agency of the State charged with regulating energy providers within the State, including but not limited to ensuring that rates are affordable and reasonable.

34.    JIJ Auction is an auction company that specializes in selling vehicles subject to garagemen's, towing, and parking liens. It spun off from another auction company located in Long Island, New York. Its current operations are in Port Jervis, New York.

35.    Pomona Auto is a small business doing business as THREE STAR SERVICE CENTER, INC., as per its attorney Jonathan Ripps. However, the two entities are registered with the State as separate corporations with the same owners. It operates as a gas station, towing service, and auto repair shop.

36.    THREE STAR SERVICE CENTER, INC. ("Three Star") is supposedly the fictitious name for Pomona Auto. However, it is registered with the State as an independent corporation. It operates as a gas station, towing service, and auto repair shop.

37.    BATTINELLI ENTERPRISES is a landscaping company based in Greenwood Lake, New Jersey. Based on previous research, it acquired Acorn Tree Service.

38.    ACORN TREE SERVICE provides arbor services in downstate New York and northern New Jersey.

39.    MCU is a not-for-profit financial institution chartered and headquartered in the State. It is regulated by the National Credit Union Administration. It has over 400,000 members, and it focuses on civil servants of New York City to increase accessibility to checking, savings, loans, and other financial products.

## JURISDICTIONAL STATEMENT

40.    Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the claims rooted in federal law, including those alleging participation in racketeering activity and hacking. The matter cannot proceed before a state court, because the laws in the State governing RICO require a conviction prior to the initiation of a civil proceeding. None of the defendants have been convicted of the violations cited herein.

41.    Jurisdiction is proper with this Court under 28 U.S.C. § 1332, because at least one of the defendants, against whom it is believed to be a legitimate claim, maintains its principal place of business and is registered in a foreign state.

42.    Jurisdiction and venue are properly with this District pursuant to 28 U.S.C. § 1394, because each defendant has substantial contact with the State by conducting business in this District and/or having a registered agent.

## FACTUAL ALLEGATIONS

43.    November 15, 2024 seemed like any other day on which Demia was harassed. By that time, she had become accustomed to the harassment and moved about her day as usual. However, she deviated a bit. After her visit to the gym, she stopped by the ATM at a nearby bank location. A pattern had formed where a person using a phone would immediately stand next to Demia while she used the ATM. In that regard, the day was consistent with previous days. She printed a mini bank statement and placed it in her vehicle.

44.    Just minutes before 12 noon, Demia visited a coffee shop and tipped cash. She then drove to the New York State Department of Motor Vehicles ("DMV") to renew her license around 12:10 PM. Suspicious about the information represented on the mini bank statement printed earlier that day, Demia decided to stop by the nearest law library to setup online access to her bank account. She visited the location in Orange County, New York, a location she had not previously visited.

45.    Demia logged into her bank account and noticed a discrepancy in the information on the mini statement printed from the ATM compared to the activity shown on the computer screen. The account was short by approximately $40 for the same date and time. She printed the statement from the computer. After doing so, a person presenting as male with a long, dark ponytail looked at Demia before returning to the office inside of the law library.

11

46.    Demia had seen that man before wearing Wiccan emblems on his clothing while delivering furniture from an Ashley's Furniture truck to a red-haired woman located in a plaza where Demia frequented a pizzeria. She would see him again running down the stairs of a public library Demia frequented in New York City in or around December 2024. She would have at least $80 mysteriously missing from her purse.

47.    Demia began traveling to another law library in a neighboring county, but before she could get there, her car stopped on the highway. Around 2 PM that day, Demia was on the side of the road in a disabled vehicle. It would have seemed like a regular breakdown except for the series of events prior to and after the vehicle became inoperable.

48.    Historical context might be helpful. Demia and her husband previously worked for law enforcement agencies. Her husband had extensive training in conducting investigations. Based on information that he shared with Demia, Demia recognized that a Tesla was tailing her from the front. The Tesla slowed down to minimize distance, a sound of an object falling occurred, and then the Tesla suddenly sped off as Demia's vehicle ceased working.

49.    The day prior, a similar event occurred – car slowed down in front of Demia and her car began experiencing issues. At that moment, she began contacting the Internal Affairs Bureau of NYPD ("IAB"). Her car miraculously resumed working. That incident formed a pattern that several other incidents followed. That particular attempt at stealing her vehicle occurred only after a person, who spoofed the number of Demia's friend, transferred $250 through a peer-to-peer application and promised to put her on the payroll if she was able to get the money that was just transferred.

12

50.    On November 15, 2024, however, the persistent culprits succeeded in disabling her vehicle.

51.    A fire engine responded to the scene, and Demia recognized the person as Mr. Klingler, except he appeared as though he had bright blue contacts. He was Demia's manager when she was employed at DSNY. In fact, it was not the only instance when she witnessed his likeness near her vehicles. He feigned an examination of the disabled vehicle, then he left the scene. A State Trooper with the surname Caban responded, and he was accompanied by a short, dark-haired male not wearing a uniform.

52.    A tow truck from Pomona Auto also responded to the scene. Trooper Caban gave Demia two (2) options – (i) have the car towed home and pay out of pocket or (ii) allow the tow truck to take the vehicle to its garage. By that time, Demia had been on involuntary leave for over a year and had no money. The $250 that had been transferred to Demia through an application was inaccessible.

53.    Manager John was the driver, and he towed Demia's vehicle to a private lot that serves as a gas station and repair shop. Demia accompanied him. He insisted that Demia give him the fob for the vehicle and reiterated his request before Demia departed the lot. Demia locked the glove compartment, removed the manual key, and handed him only the fob.

54.    Over an hour passed before Demia left the lot. She contacted her insurance company to make arrangements for her vehicle, but Manager John demanded that Demia get off the phone. Another man arrived on the scene wearing a hat (the "Unidentified Man at Shop"). Demia would later see this man driving her vehicle down the street.

13

55.    Prior to Demia removing some of her personal items from the vehicle and locking the glove compartment, she had a contentious exchange with Manager John. Demia challenged him on the legitimacy of his actions, and he retorted that he had been doing his work for more than 45 years. Demia continued that his length in practice did not establish the quality of his experience. Demia's use of "experience" incited Manager John, and he commanded her not to speak on his experience. He ended the interaction with describing it as "personal".

56.    The addition of that description reminded Demia of Ewelina Piekut's description of her harassment of Demia – personal.

57.    The Unidentified Man at Shop finished a brief discussion with Manager John and stood next to Demia. He smiled and greeted her. Demia was not welcoming given her personal situation. He then called her "crazy" and walked away with his hands in pockets to talk with Manager John.

58.    Demia overheard parts of the conversation between Manager John and the Unidentified Man at Shop. The Unidentified Man at Shop ended the conversation by characterizing something as a good deal. Demia did not hear the details.

59.    When Demia's efforts to resolve the issues with her vehicle were unsuccessful, she walked to the State Troopers barracks around 5 PM to contact a shelter. Her phone continued looping while she was at Pomona Auto, and for that reason, she could not access any applications. Two (2) troopers came out to the lobby area. She believed one of the troopers to be KEVIN RAMNARAIN, who ordered her to get her stuff and go after using the restroom. He was not in fact a trooper, but he was using the intelligence resources at that moment so that he

14

could impersonate one. Without contacting a shelter, Demia walked to the nearest bus stop. She then saw the Unidentified Man at Shop drive by her in her vehicle and merge onto the highway.

60.     While waiting for transportation, Demia contacted IAB c. 8:00 PM to report that she suspected that her vehicle was stolen by members of service. She spoke with a lieutenant, detective, and officer regarding her complaint. She was assigned a case number. She eventually made it home.

61.     Since her car was taken, Demia attempted to arrange for its retrieval. She spoke with the car dealership, insurance company, and company that issued the extended warranty on the vehicle. After speaking with those representatives, Demia informed Pomona Auto on November 18, 2024 that she arranged for pickup of the vehicle.

62.     On November 19, 2024, she called Pomona Auto around 7:15 AM, 10:30 AM, 11:40 AM, and 12:15 PM. She spoke with Joe, a representative of Pomona Auto, before she managed to get in contact with Manager John, who was still hostile. She informed Pomona Auto that the insurance company would remit payment and a tow truck would retrieve the vehicle. The Pomona Auto representative responded that it did not accept payment from insurance companies.

63.     Demia returned to Pomona Auto on at least two (2) more occasions – on or around November 21, 2024 and December 3, 2024 – to retrieve her vehicle. Prior to Demia's next visit, she was in a coffee shop. A group of women entered the shop and telepathically, Demia heard a warning not to get the car because it was a setup. Nevertheless, Demia had no reason to trust the alert or the source. She ordered a car to take her to the gas station where her vehicle was kept.

64.     When Demia arrived at the station, she had deposited the money from the peer-to-peer application and intended to use it to get her vehicle released. While she waited to

15